Filed 7/14/16  P. v. Stillwell CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>DUANE STILLWELL,<br><br>      Defendant and Appellant. | H041819<br>(Santa Clara County<br>Super. Ct. No. 212036) |

## I.      INTRODUCTION

After a first trial resulted in a mistrial due to jury deadlock, a second jury found that defendant Duane Stillwell was a sexually violent predator within the meaning of the Sexually Violent Predators Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.).  The trial court ordered defendant committed to the California Department of Mental Health for an indeterminate term and transported to a hospital under the State Department of State Hospitals (the Department).

On appeal, defendant contends the trial court erred by allowing evidence of his testimony from the first trial to be introduced at the second trial after he refused to testify. He contends that, under the equal protection clauses of the state and federal Constitutions, prospective sexually violent predators (SVP's) have a right not to testify, because such a right is afforded to persons committed for treatment after being found not

guilty by reason of insanity (NGI's). Defendant further contends the trial court erred by permitting the jury to draw adverse inferences from his refusal to testify, by allowing the prosecution to present a hearsay statement and refusing to allow defendant to introduce evidence impeaching the hearsay declarant, by failing to give a pinpoint instruction on the meaning of the word "likely" that would have included the phrase "high risk of offense," and by permitting the prosecution to use the term "sexually violent predator." Defendant also contends there was cumulative error and that his indeterminate commitment under the SVPA violates the federal Constitution's guarantees of equal protection and due process, as well as the federal Constitution's prohibition against ex post facto laws and double jeopardy.

Following the rationale of *People v. Curlee* (2015) 237 Cal.App.4th 709 (*Curlee*), we find that the record is inadequate for us to resolve defendant's claim that under the equal protection clauses of the state and federal Constitutions, he had a right not to testify at the SVPA proceedings. We will therefore remand this matter to the trial court and direct the trial court to conduct an evidentiary hearing at which the People will have the opportunity to show that the differential statutory treatment of SVP's and NGI's is justified with respect to the right not to testify. We find that defendant's other claims lack merit.

## II.     BACKGROUND

### A.     *Commitment Petition and Pretrial Proceedings*

On January 25, 2012, the Santa Clara County District Attorney filed a petition to commit defendant under the SVPA. (See Welf. & Inst. Code, § 6601, subd. (i).) The petition alleged that defendant was in prison with a parole date of March 10, 2012. In a declaration attached to the petition, the prosecutor alleged that defendant's prior offenses included three 1982 convictions—one for forcible sodomy (Pen. Code, § 286, subd. (c)) and two for forcible oral copulation (Pen. Code, § 288a, subd. (c))—and two 1983

2

convictions—one for forcible sodomy and one for forcible oral copulation. Also attached to the petition were reports from two psychologists who had recently evaluated defendant. (See Welf. & Inst. Code, § 6601, subds. (a)-(h).)

After a hearing, the trial court found probable cause to believe that defendant was likely to engage in sexually violent predatory criminal behavior upon his release. (See Welf. & Inst. Code, § 6602, subd. (a).)

Defendant filed a written objection to the indeterminate term of commitment he would receive if found to be an SVP, requesting that the trial court suspend the proceedings in his case pending the outcome of the hearing ordered by *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee I*).[1] Defendant also filed motions in limine, in which he requested the trial court bar the use of the term "sexually violent predator", give the jury a pinpoint instruction regarding the definition of the phrase "likely [to] engage in sexually violent criminal behavior" (see Welf. & Inst. Code, § 6600, subd. (a)), and preclude the prosecution from calling him to testify based on the equal protection clauses of the state and federal Constitutions. The trial court found that the term "sexually violent predator" could be used during the trial, declined to give the proposed pinpoint instruction, and ruled that the prosecution could call defendant to testify.

A trial began on January 31, 2014, but it ended in a mistrial after the jury deadlocked. During that first trial, defendant was called to testify by the prosecution.

A second trial began on November 21, 2014. Prior to the second trial, defendant refiled his motions in limine. The trial court again found that the term "sexually violent

---

[1] In *McKee I,* the California Supreme Court ordered a hearing on whether there was justification for differential treatment of individuals committed under the SVPA, who are subject to an indeterminate term, and individuals committed under other civil commitment schemes, who are subject to determinate commitment terms. (*McKee I, supra,* 47 Cal.4th at pp. 1208-1209.) In *People v. McKee* (2012) 207 Cal.App.4th 1325 (*McKee II*), the Court of Appeal upheld the trial court's subsequent finding that the disparate treatment of SVP's was justified. (*Id.* at p. 1347.)

predator" could be used during the trial, denied defendant's request for a pinpoint instruction regarding the definition of the phrase "likely [to] engage in sexually violent criminal behavior" (Welf. & Inst. Code, § 6600, subd. (a)), and ruled that the prosecution could call defendant to testify. When the prosecution called defendant to testify, he invoked the Fifth Amendment and refused to answer questions. The trial court found that defendant was unavailable and allowed the prosecution to present evidence of defendant's prior testimony.

### B.    Prosecution Expert Witnesses

#### 1.    Dr. Patterson

Mark Patterson, a licensed psychologist, evaluated defendant in December of 2011. In advance of the evaluation, he reviewed records from the Department of Mental Health as well as defendant's prison file and prison medical file.[2] Defendant declined to be interviewed at the time; he also declined to be interviewed in February of 2013 and October of 2014.

Dr. Patterson testified about defendant's documented criminal history. In September of 1977, when defendant was about 19 years old, he was arrested for loitering. Also in 1977, defendant was arrested for loitering and prostitution, and he was convicted of both charges.

In 1978, defendant was charged with animal cruelty and inhumane treatment to animals. Defendant had testified about the incident at his first trial, and Dr. Patterson had reviewed his testimony. Defendant "said that he took his dog to work and left it in his vehicle," intending to take care of it during breaks. Also in 1978, defendant was charged with trespassing, and with robbery of a co-worker.

---

[2] A prison file typically contains charging documents, sentencing documents, classification documents, disciplinary documents, and visitation documents. It may also contain police reports and probation reports.

In 1979, defendant was charged with two robberies. Both incidents occurred on the same day and both resulted in convictions at a joint trial. In each case, defendant approached the victim, offered him a ride, engaged in unwelcomed sexual conduct with him, and took items from him. The first victim was named Rodolfo; the second was named Richard. Rodolfo told police defendant had used a knife during the incident. When testifying at the first trial, defendant described most of the sexual conduct with Rodolfo and Richard as consensual.

In 1981, eight months after being released from custody for the 1979 robberies, defendant committed offenses against two more victims. The first offense involved defendant forcing James, a 16-year-old boy, into his car, driving to a remote location, threatening James with a knife, and engaging in forcible sodomy and forcible oral copulation. The second offense occurred six days later and involved another juvenile victim, named Adam. Defendant offered Adam a ride, then assaulted him, threatened him with a knife, engaged in forcible oral copulation, and then masturbated. Defendant was convicted of multiple crimes, including forcible sex offenses, false imprisonment, and robbery, and he was sentenced to prison for 39 years.

While in jail after his arrest for the offenses relating to James and Adam, defendant was in a cell with a 19-year-old male named Bennett. On a daily basis, defendant engaged in various forcible sex acts with Bennett, along with threats, punching, and choking. Defendant was charged with and convicted of criminal offenses stemming from his conduct against Bennett.[3]

---

[3] Bennett testified at defendant's SVP trial. He described how defendant punched him and made him orally copulate defendant on numerous occasions, and how defendant forcibly sodomized him on multiple occasions. Defendant also made Bennett kneel on the floor, then urinated in Bennett's mouth. On several occasions, defendant had choked Bennett into unconsciousness. Defendant threatened to "take out" one of Bennett's family members if Bennett reported the assaults. After Bennett reported the assaults, defendant pressured Bennett into writing a letter recanting his allegations.

Since going to prison in 1982, defendant had a "significant number" of disciplinary problems, including both serious rule violations and minor rule violations. The violations included disobeying orders, fighting, being out of bounds or in unauthorized areas, verbal abuse of staff, possession of alcohol, possession of contraband, theft of state property, and battery or assault on an inmate. Defendant's most recent rules violation was in 2010, for fighting. After being transferred to a state hospital in June of 2012, defendant also had violated rules.

During his initial evaluation of defendant, Dr. Patterson had diagnosed defendant with sexual sadism, polysubstance dependence, and a personality disorder, not otherwise specified, with narcissistic and antisocial traits. Since that time, the diagnostic manual had changed, which led to changes in his diagnoses. At the time of trial, Dr. Patterson's diagnoses were sexual sadism disorder, alcohol abuse, cannabis abuse, and other specified personality disorder with narcissistic and antisocial traits. Sexual sadism is a deviant sexual disorder that involves intense sexual arousal and causes the person to hurt others. The traits included in defendant's personality disorder included being very manipulative, deceptive, controlling, egocentric, and self-centered, as well as having angry outbursts. Defendant also exhibited psychopathic traits in that his crimes showed a lack of empathy, callousness, and both physical and sexual violence. Defendant's combination of sexual deviance and personality traits put him "particularly at risk for sexual re-offending." Defendant's sexual sadism impaired him emotionally and volitionally.

Dr. Patterson opined that there was a substantial risk that defendant would "re-offend sexually in a violent and predatory way." Dr. Patterson had conducted a risk assessment using a variety of tools. On the Static-99R, which looks at ten different static factors, defendant scored an eight, putting him in the 99th percentile. Forty-five percent of offenders with that score will reoffend within five years of release into the community, and 55 percent will reoffend within 10 years. On the Static-2002R, a similar instrument,

6

defendant also scored an eight, which put him in the 95th percentile. About 35 percent of offenders with that score will reoffend within five years of release into the community, and about 45 percent will reoffend within 10 years. On the SRA-FV, a tool that looks at dynamic factors, defendant's risk factors included his sexual preoccupation, his difficulty controlling anger, and his reliance on substances to cope with difficulties. Defendant's dynamic risk factors also included his psychopathic traits such as callousness and externalization of blame, which were shown by his prior testimony about his sex offenses.

Dr. Patterson did not believe that defendant's age at the time of trial—56 years old—reduced his risk of committing future crimes. Age does not become a "protective factor" until a person reaches age 70. Likewise, it was not significant that defendant had not committed any sexual offenses while in prison, because defendant had spent most of his prison time without "access, by virtue of not having a cellmate, to have sexual relations."[4] While in prison, defendant had declined sex offender treatment.

Dr. Patterson found it significant that when defendant testified at the first trial, he claimed to have been working as a prostitute around the time of his sex offenses. Defendant's commission of sex offenses during a time when he had consenting partners demonstrated his motivation to have non-consensual sexual interactions.

### 2.     Dr. Dawn Starr

Dawn Starr, a licensed psychologist, also performed an evaluation of defendant in December of 2011. Dr. Starr updated her evaluation twice, including in October of 2014, two months before her testimony at the second trial. Defendant declined to be interviewed each time.

---

[4] Defendant had been put into Administrative Segregation within two years of beginning his prison sentence, and he was "in single cell" for at least a decade.

7

Dr. Starr had reviewed the records relating to defendant's prior offenses, his prison files, and records from the Department. Dr. Starr had diagnosed defendant with suffering from "other specified paraphilic disorder," meaning that defendant had an intense and persistent sexual interest that was not an interest involving consenting, mature human partners—i.e., a deviant sexual interest. Dr. Starr's other diagnoses related to his alcohol, stimulant, and cannabis abuse. Dr. Starr also believed defendant had "some underlying antisocial personality features."

Like Dr. Patterson, Dr. Starr found it significant that defendant had available consensual sexual partners but still engaged in nonconsensual sexual activity with "young guys." Specifically, defendant had testified at the first trial that he was working as a prostitute at the time of his sex offenses. Also like Dr. Patterson, Dr. Starr found it insignificant that there had not been any reports of defendant committing a sexual assault during the 30-plus years that he had been in prison, because during most of that time he had been "at the highest level of security."

Dr. Starr described the traits that led to her conclusion that defendant had "antisocial personality features." Defendant had exhibited irresponsibility, aggressiveness, reckless disregard for the safety of others, and lack of remorse. Defendant had also shown deceitfulness: he had constantly changed his story about what had happened during his sexual offenses, including when he testified at the first trial and "gave a brand new story." Dr. Starr found it "particularly bizarre" when defendant testified that he had picked up the two juvenile victims (James and Adam) because he thought they were "prostituting in his area" and he wanted to "teach them a lesson." Defendant had spoken of the incidents in the present tense, and his story had been inconsistent with the reported facts of the cases. Defendant had claimed to not have known that James was under 18 years of age, and he had denied raping James. Defendant had claimed that James became upset when defendant did not give him "his turn for sex." Also, defendant had claimed he had orally copulated the other victim (Adam) in an

8

attempt to get him not to report the robbery. Dr. Starr opined that defendant's testimony showed he did not fully accept responsibility for that assault.

Dr. Starr also discussed defendant's prior testimony about the Richard and Rodolfo incidents. Defendant had denied engaging in sexual conduct with either victim. To Dr. Starr, this further showed defendant's deceitfulness and lack of empathy, and it showed he had not changed. Dr. Starr acknowledged that in Rodolfo's case, the trial court had found an arming allegation untrue despite Rodolfo's claim that defendant had used a knife.

Dr. Starr had also observed defendant's testimony about the charges relating to his cellmate, Bennett. Defendant had claimed the sex acts were consensual, and he had denied using any threats or violence.

Dr. Starr believed defendant had not changed during his many years in custody, based on the evidence of his attitude and disciplinary problems in prison and in the state hospital. While in the state hospital, defendant had exhibited behavior indicating he believed he did not need to follow the rules, such as sneaking food and shaking foot powder all over the floor. In Dr. Starr's opinion, defendant continued to pose a danger of re-offense because his "personality structure" had not changed. Like Dr. Patterson, Dr. Starr had determined that defendant scored an eight on both the Static-99R and the Static-2002R. Dr. Starr acknowledged that defendant's scores would drop when he reached age 60. However, defendant would still be "high-risk."

Dr. Starr had read the defense experts' evaluations of defendant. She was aware that both experts had been "doing a lot of defense work" and that one of the experts, Dr. Alumbaugh, had made a statement indicating she was "going to start finding a lot of patients negative" after learning that the Department had changed the pay rate for evaluators. The other defense expert, Dr. Frances, had expressed the opinion that paraphilia-NOS was a "misused" diagnosis—an opinion that was not shared by other experts.

9

Dr. Starr agreed with Dr. Patterson that defendant's risk of reoffense was not affected by the fact he had not committed further sex offenses while in prison. She explained that in prison, defendant was "highly monitored," even for the first few years, when he was in the general population.

### C.     Defense Expert Witnesses

#### 1.     Dr. Frances

Allen Frances, a psychiatrist, had not personally evaluated defendant nor read the documents associated with his prior crimes such as the police reports and probation reports. Dr. Frances had, however, reviewed the evaluation reports of Dr. Patterson and Dr. Starr, which included information from those documents. All of Dr. Frances's prior testimony in SVP cases had been on behalf of the alleged SVP, and he had never been on the panel of evaluators for SVP evaluations.

Dr. Frances acknowledged that defendant's crimes were horrible and reprehensible, but he did not believe that the crimes indicated defendant suffered from sexual sadism or showed defendant had any other mental disorder. Dr. Frances believed that defendant's crimes showed he had simply engaged in "the repetitive pattern of a rapist." While defendant had inflicted pain and demonstrated callousness, sexual sadism requires "much more specific, repetitive, preferential use of pain as the way of getting excited." Dr. Frances was also critical of Dr. Starr's diagnosis of unspecified paraphilia, describing such a diagnosis as following "no criteria" and being unreliable. Additionally, Dr. Frances opined that there was nothing in the record to support Dr. Patterson's diagnosis of an unspecified personality disorder. The fact that Dr. Patterson and Dr. Starr failed to agree on a diagnosis, moreover, rendered their diagnoses "essentially meaningless."

#### 2.     Dr. Alumbaugh

Mary Jane Alumbaugh, a clinical psychologist and a member of the Department's panel of SVP evaluators, had interviewed defendant two times in 2013 and once in 2014.

Dr. Alumbaugh had spoken with defendant's sister, reviewed documents from defendant's criminal history, and reviewed the reports of Dr. Patterson and Dr. Starr. Dr. Alumbaugh denied that she had begun doing defense work out of frustration about the rate of pay for SVP evaluations.

Defendant told Dr. Alumbaugh about his family background. Defendant reported having been very close with his mother, who "checked out" after her oldest son drowned. Defendant reported that his father would criticize him and call him "a fucking fag." As a teenager, defendant struggled with his sexuality and eventually was "out on the streets" using drugs and "selling himself."

Defendant also discussed his criminal history with Dr. Alumbaugh. He claimed that he had believed the sex with James was consensual but conceded he had threatened one of the victims into having sex with him. Defendant claimed the sex with Bennett had started out as consensual, but he admitted that eventually he had taken "control" so that the situation "went out bad."

Dr. Alumbaugh did not believe that defendant suffered from sadism (as diagnosed by Dr. Patterson) or paraphilia (as diagnosed by Dr. Starr). Sadism requires more than the use of force and violence: "What you have to see is an escalating sexual excitement the more the victim suffers." She believed defendant was a rapist, but "[r]ape does not equate to sadism." Defendant's history of rapes also did not show that he suffered from paraphilia, because there was no evidence that he was driven by the need for sexual coercion. Moreover, someone suffering from paraphilia would have displayed "[s]ome sort of sexual deviance" during the prior 30-plus years, even in prison. Dr. Alumbaugh believed defendant chose to be a criminal; he did not suffer from volitional impairment caused by a mental disorder.

Like Drs. Patterson and Starr, Dr. Alumbaugh determined that defendant scored an eight on the Static-99R. Nevertheless, she did not believe defendant was likely to reoffend. Even though group data showed a recidivism rate of about 23 percent within

11

five years, the data did not address a particular individual's likelihood of reoffending. She believed the more appropriate recidivism rate was 12 percent—the rate at which male rapists in their 50's reoffend. At age 60, defendant's risk of reoffense would go down to about three percent.

In his interviews with Dr. Alumbaugh, defendant expressed remorse for his crimes. Defendant had completed courses entitled, "Changing Your Thinking" and "Empathy and Emotional Intelligence."

## III.    DISCUSSION

### A.    *Admission of Defendant's Prior Testimony*

Defendant contends that he had a right not to testify against himself in his SVPA commitment trials. His argument is based on the equal protection clauses of the state and federal Constitutions: he contends a person subject to SVPA commitment proceedings is similarly situated to a person found not guilty by reason of insanity (NGI) who is subject to commitment proceedings and who has a right not to testify against himself or herself. (See Pen. Code, § 1026.5, subd. (b)(7) [NGI's are "entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings"]; *Hudec v. Superior Court* (2015) 60 Cal.4th 815, 832 (*Hudec*).) Defendant contends the trial court therefore erred by admitting his testimony from the first trial (through the testimony of the prosecution's expert witnesses) and by telling the jury it could assess defendant's refusal to testify when determining his credibility.

### 1.    **Proceedings Below**

As noted above, defendant filed motions in limine before both his first and second trials, arguing that he had a right, under the equal protection clauses of the state and federal Constitutions, not to testify. In his motions, defendant compared SVPA commitment proceedings to commitment proceedings under Welfare and Institutions Code section 1800, which pertains to juveniles. The trial court denied the motions, ruling

12

that the prosecution could call defendant as a witness. The prosecution called defendant to testify at the first trial, and defendant responded to questions by the prosecution.

Prior to the second trial, defendant not only refiled his prior motions in limine, but he also moved to preclude Dr. Starr from testifying, because she had been allowed to observe defendant's testimony at the first trial and had been allowed to diagnose defendant based on those observations. Defendant noted that Dr. Starr's opinion had changed after hearing defendant's testimony: she had initially been "borderline" on whether or not defendant suffered from a personality disorder, but after defendant's testimony, she had concluded that defendant suffered from antisocial personality disorder with narcissistic traits.

The trial court ruled that Dr. Starr could testify about her observations of defendant's testimony at the first trial, where he was asked about his criminal offenses but minimized or denied much of the conduct. The trial court indicated that one reason for its ruling was that defendant had refused to be interviewed for his evaluations.

The prosecution called defendant to testify at the second trial, after Dr. Patterson testified and before Dr. Starr testified. The prosecutor asked defendant whether he had been truthful in court when he testified in "prior proceedings . . . dating back to the late 1970s." Defendant replied that he was "going to have to exercise" his Fifth Amendment right not to answer the questions. The prosecutor told defendant he did not have such a right and asked the question again, specifying that she wanted to know whether defendant had been untruthful in the 1979 trial involving the crimes against Rodolfo and Richard. Defendant again replied that he was invoking the Fifth Amendment. After the trial court told defendant he did not have a Fifth Amendment right not to answer the question, defendant replied that he did not remember what he had said at the prior trial. Upon further questioning from the prosecution, defendant maintained he had a Fifth Amendment right not to respond, despite the trial court telling defendant that if he refused to answer, "that can be assessed by the jury in determining your credibility,

13

reliability, and accuracy." After defendant once again stated that he was "going to have to take the Fifth Amendment," the trial court struck defendant's testimony, admonished the jury to disregard it, and deemed defendant unavailable, such that the prosecution could introduce his testimony from the first trial. (See Evid. Code, § 240.)

During argument to the jury, the prosecutor noted that "things like can't follow rules, can't follow a court order to answer questions in a trial" showed that defendant suffered from psychopathy. The prosecutor asked "why would we believe" that someone who could not "follow basic rules" would not "commit the same offenses" that he committed in the past.

### 2. Forfeiture

The Attorney General contends defendant forfeited his specific equal protection claim, which compares SVPA commitment proceedings to NGI commitment proceedings. As noted above, defendant's motion in limine compared SVPA commitment proceedings to commitment proceedings under Welfare and Institutions Code section 1800. The Attorney General contends that because defendant's motion in limine did not make the exact same argument that he now makes on appeal, we should decline to consider the issue.

As the Attorney General acknowledges, a similar forfeiture argument was rejected in *Curlee, supra,* 237 Cal.App.4th 709. In *Curlee,* the defendant was called as a prosecution witness but did not object on equal protection grounds. (*Id.* at pp. 712-713.) The appellate court nonetheless exercised its discretion to consider the issue. The court explained that at the time of Curlee's trial, there was published case law holding that a person could be called to testify against himself or herself in an SVPA commitment proceeding, and there was a split of authority as to whether an NGI could be called to

14

testify against himself or herself.[5]  (*Id.* at p. 714.)  Considering the state of the law at the time of Curlee's commitment trial, it was "not unreasonable to assume that an objection would have been futile and to apply the rule that a party is not required to make fruitless objections."  (*Id.* at p. 715.)  In addition, the court noted that considering the significant liberty issue at stake in an SVPA commitment proceeding, it was "an appropriate exercise of [its] discretion to consider Curlee's contention for the first time on appeal," as well as "to forestall a later claim of ineffective assistance of counsel.  [Citations.]"  (*Id.* at p. 716.)

Similar considerations apply in the instant case.  At the time of defendant's SVPA commitment hearing, the right of NGI's not to testify—an essential component of defendant's equal protection claim—was not firmly established.  (See *Hudec, supra,* 60 Cal.4th 815.)  Defendant's trial counsel may reasonably have believed that an argument based on a comparison of the SVPA and NGI commitment proceedings would not have been successful.  Moreover, as stated in *Curlee,* addressing this issue is an appropriate exercise of our discretion in light of the significant liberty issue at stake in an indefinite SVPA commitment and because doing so will forestall a claim of ineffective assistance of counsel.

### 3.     Prejudice

The Attorney General also argues that we need not address the merits of defendant's equal protection claim because even if the trial court erred by allowing the prosecution to call him as a witness and present his prior testimony through its expert witnesses, defendant was not prejudiced.  The Attorney General contends that such an error would be reviewed under the state law standard set forth in *People v. Watson* (1956)

---

[5] *Hudec, supra,* 60 Cal.4th 815 subsequently held that an NGI may *not* be compelled to testify at a commitment extension hearing.

15

46 Cal.2d 818 (*Watson*), and that there is no reasonable probability that the jury would have reached a different verdict because defendant "never testified" at his second trial.

Defendant contends that prejudice should be assessed under the standard for federal constitutional error set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) and that "it is impossible to say . . . beyond a reasonable doubt" that the use of defendant's prior testimony, combined with the comments of the trial court and the prosecutor, did not contribute to the verdict. Defendant contends that the trial court's ruling was prejudicial because it permitted the prosecution to introduce defendant's testimony from the first trial, prior to which he had also objected to being compelled to testify on the basis of equal protection.

On this record, we would conclude that if the trial court erred by permitting the prosecution to call defendant as a witness and by permitting the prosecution to introduce defendant's prior testimony, the error was not harmless under either the *Watson* or *Chapman* standards. Defendant's prior testimony played a substantial part in Dr. Starr's opinions and testimony. For instance, Dr. Starr found it significant that although defendant testified he had been working as a prostitute at the time of his offense and therefore had consensual sex partners, he had still engaged in non-consensual sexual acts with the victims. Dr. Starr found defendant's prior testimony important to her conclusion that defendant had "antisocial personality features," and to her conclusion that defendant was deceitful, lacked empathy, and had not changed. Dr. Patterson also based some of his opinions on defendant's prior testimony. It is also significant that the jury was permitted to assess defendant's credibility based on his refusal to testify. (See *People v. Haynie* (2004) 116 Cal.App.4th 1224, 1230 [citing *Cramer v. Tyars* (1979) 23 Cal.3d 131 for the proposition that "permitting the jury to observe the person sought to be committed and to hear him speak and respond provided 'the most reliable proof and probative indicator of the person's present mental condition' "].) In addition, the prosecutor referred to defendant's refusal to testify during argument, the prosecution experts did not

16

agree on a diagnosis, and the defense experts testified that they did not believe defendant suffered from a mental disorder.  On this record, it is reasonably probable that the jury would have reached a different verdict had the trial court not ruled that defendant could be compelled to testify (see *Watson, supra,* 46 Cal.2d at p. 836) and we cannot say beyond a reasonable doubt that the ruling "did not contribute to the verdict obtained" (*Chapman, supra,* 386 U.S. at p. 24).  We will therefore proceed to consider the merits of defendant's equal protection claim.

### 4.      Analysis

" ' "The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." [Citations.]  This initial inquiry is not whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged." ' [Citation.]  In other words, we ask at the threshold whether two classes that are different in some respects are sufficiently similar with respect to the laws in question to require the government to justify its differential treatment of these classes under those laws." (*McKee I, supra,* 47 Cal.4th at p. 1202.)

When personal liberty is at stake, "the applicable standard for measuring the validity of the statutory scheme [at issue] requires application of the strict scrutiny standard of equal protection analysis.  Accordingly, the state must establish both that it has a 'compelling interest' which justifies the challenged procedure and that the distinctions drawn by the procedure are necessary to further that interest.  [Citation.]" (*In re Moye* (1978) 22 Cal.3d 457, 465 (*Moye*).)

Defendant contends that prospective SVP's are similarly situated to prospective NGI committees with respect to the question of whether they can be compelled to testify in their commitment proceedings, and that under the strict scrutiny standard, there is no justification for disparate treatment in this regard.

17

This issue was recently addressed in *Curlee, supra,* 237 Cal.App.4th 709. The *Curlee* court first reviewed *Moye, supra,* 22 Cal.3d 457, in which the California Supreme Court compared NGI commitments to commitments under the former Mentally Disordered Sex Offender Act (MDSOA), which was the forerunner to the SVPA. (See *Curlee, supra,* at p. 716.) *Moye* considered whether, under principles of equal protection, NGI committees could be confined beyond the maximum term for the underlying offense unless "they can establish their own fitness for release" by a preponderance of the evidence, in light of the fact that under other statutory schemes such as the MDSOA, the People had the burden to justify commitment. (*Moye, supra,* at p. 463.) *Moye* held that persons committed under the MDSOA were "quite similar" to those found to be NGI's: "Both classes, for example, involve persons who initially have been found to have committed a criminal act, but whose mental condition warrants a period of confinement for treatment in a state institution, in lieu of criminal punishment." (*Ibid.*) Applying the strict scrutiny standard of equal protection analysis (*id.* at p. 465), *Moye* further held that the People "failed to justify the different treatment of the two classes of committed persons" (*id.* at p. 466).

Next, the *Curlee* court discussed *McKee I,* which involved numerous challenges to the indeterminate term of commitment provided for by the SVPA. (See *Curlee, supra,* 237 Cal.App.4th at pp. 717-719.) In *McKee I*, one of the court's holdings was that SVP's were similarly situated to NGI's and that the People had not yet justified the differences in the length of commitments under the two statutory schemes. (*McKee I, supra,* 47 Cal.4th at p. 1207.) The court explained that on remand, the People would need to show that SVP's "as a class bear a substantially greater risk to society" than NGI's and persons committed under the Mentally Disordered Offender (MDO) scheme, "and that therefore imposing on them a greater burden before they can be released from commitment is needed to protect society." (*Id.* at p. 1208.)

18

The *Curlee* court then discussed *McKee II,* which was the appeal after the remand ordered by *McKee I.* (See *Curlee, supra,* 237 Cal.App.4th at pp. 719-720.) The *McKee II* court explained that on remand, the trial court had found that the People had met their burden to establish that the indeterminate term requirement of the SVPA was justified by the perceived "greater and unique dangers" that potential SVPA committees pose compared to MDO's and NGI's. (*McKee II, supra,* 207 Cal.App.4th at p. 1332.) Specifically, the People presented "evidence showing the inherent nature of the SVP's mental disorder makes recidivism significantly more likely for SVP's as a class than for MDO's and NGI's" (*id.* at p. 1340), "evidence that the victims of sex offenses suffer unique and, in general, greater trauma than victims of nonsex offenses," which is relevant to show that SVP's pose "a greater risk to a particularly vulnerable class of victims than do MDO's and NGI's" (*id.* at p. 1342), and "evidence showing SVP's are significantly different from MDO's and NGI's diagnostically and in treatment" (*id.* at p. 1344).

After analyzing these cases, the *Curlee* court addressed the question of whether SVP's were similarly situated to NGI's for purposes of the right against self-incrimination. (*Curlee, supra*, 237 Cal.App.4th at p. 720.) The Attorney General claimed that the two groups were not similarly situated, in that hospital records are more available in an NGI extension hearing than in an SVP commitment proceeding, because an NGI has already been in treatment by the Department, unlike an SVP. (*Ibid.*) Curlee disagreed, pointing out that an SVP undergoes at least two evaluations and may be committed to the state hospital pending trial. (*Ibid.*) The *Curlee* court found that the record in that case was "inadequate" for determining whether there was, in fact, a difference in the amount of medical information available under the two commitment schemes and concluded that the two groups *were* similarly situated for the purpose of compelled testimony. (*Id.* at p. 721.) The court explained, "Both groups have committed a criminal act and have been found to suffer from a mental condition that might present a danger to others. [Citation.] At the end of the SVP's prison term, and at the end of the

19

term for which an NGI could have been imprisoned, each is committed to the state hospital for treatment if, at the end of that period, the district attorney proves in a jury trial beyond a reasonable doubt that the person presents a danger to others as a result of a mental disease, defect, or disorder.  [Citations.]  The purpose of the commitment is the same:  To protect the public from those who have committed criminal acts and have mental disorders and to provide mental health treatment for the disorders.  [Citations.]" (*Id.* at p. 720.)

Next, the *Curlee* court examined whether the People had justified the disparate treatment between SVP's and NGI's with respect to the right against self-incrimination. (*Curlee, supra*, 237 Cal.App.4th at p. 721.)  The Attorney General's first argument was similar to her argument about the two groups being similarly situated:  that the disparate treatment was justified in that "hospital records are more available in an NGI extension hearing and in an SVP commitment proceeding," and therefore that an SVP's testimony is more necessary than that of an NGI.  (*Ibid.*)  The *Curlee* court reiterated that the record in that case was "inadequate" for determining whether there was, in fact, a difference in the amount of medical information available under the two commitment schemes and thus whether the disparate treatment was justified on that basis.  (*Ibid*.)

The *Curlee* court then addressed the Attorney General's argument that the factors justifying an indefinite commitment for SVP's also justified the fact that SVP's may be called as witnesses.  (*Curlee, supra,* 237 Cal.App.4th at p. 721.)  The court was not persuaded that these factors—the greater likelihood that SVP's will commit new sexual offenses when released, the greater trauma suffered by victims of sex offenses, and the lower likelihood that SVP's will participate in treatment—also showed "that an SVP's *testimony* is more necessary than that of NGI's."  (*Ibid*.)  The court questioned whether there was a "nexus between these factors and the need for compelled testimony from an SVP, but not an NGI."  (*Id.* at p. 722.)  In the end, because the equal protection issue in *Curlee* had not been litigated in the trial court, *Curlee* followed *McKee I*'s lead and

20

remanded the matter to the trial court for an evidentiary hearing, to allow the People to demonstrate a justification for giving NGI's the right against self-incrimination but not SVP's. (*Ibid.*)

In the instant case, the Attorney General contends "*Curlee* was incorrect and should not be followed." The Attorney General first argues that SVP's and NGI's are not similarly situated for the purpose of compelled testimony. The Attorney General contends the *Curlee* court erred by finding that there was insufficient evidence to determine whether a greater amount of treatment data was available in an NGI proceeding than in an SVPA proceeding. We agree with *Curlee* that this argument "is more closely connected to the question of whether the [state] has justified the disparate treatment of NGI's and SVP's than to the question of whether they are in fact similarly situated." (*Curlee, supra*, 237 Cal.App.4th at p. 721.) We will therefore address the Attorney General's assertion regarding the amount of available treatment data in the context of determining whether there is justification for disparate treatment of NGI's and SVP's.

The Attorney General argues that it is true "as a *legislative fact*" that there is a greater amount of treatment data available in NGI commitment proceedings than in SVPA proceedings. The Attorney General contends this position is supported by *Jones v. United States* (1983) 463 U.S. 354 (*Jones*), which compared statutory schemes for NGI commitments and civil commitments for persons who are mentally ill and likely to injure themselves or others. (*Id.* at pp. 358-359.) *Jones* held that there were "important differences" that justified differing standards of proof: a preponderance of the evidence for NGI commitments, but clear and convincing evidence for civil commitments. (*Id.* at p. 367.) The *Jones* court explained that there was "diminished concern as to the risk of error" in the NGI scheme, because a commitment "follows only if the *acquittee himself* advances insanity as a defense and proves that his criminal act was a product of his

21

mental illness," whereas the civil commitment scheme required the government to prove the person had a mental illness and was dangerous. (*Id.* at p. 367, fns. omitted.)

The *Curlee* court found *Jones* did not support a finding that NGI's and SVP's were similarly situated for purposes of compelled testimony because *Jones* "allowed a lower standard of proof for NGI's—that is, *less favorable* treatment—because they had already advanced their insanity as a defense and proved their criminal acts were a result of their mental illness. [Citation.]" (*Curlee, supra,* 237 Cal.App.4th at p. 721, fn. 6.) In the present case, defendant's argument is based on the claim that there is no justification to give NGI's *more favorable* treatment than SVP's. We also note that the issue in *Jones* could be resolved based on the express provisions of the statutes at issue. By contrast, the Attorney General's argument about the greater availability of treatment records rests on an assumption drawn from the statutory schemes. Thus, we agree with the *Curlee* court that it "may or may not be true" that "hospital records are more available in an NGI extension hearing than in an SVP commitment proceeding, and therefore the SVP's testimony is more necessary than that of an NGI," but that this is a question of fact and that "the record before us is inadequate for us to make that determination." (*Id.* at p. 721.)

As in *Curlee,* we will remand this matter to the trial court and direct the trial court to conduct an evidentiary hearing at which the People will have the opportunity to show that the differential statutory treatment of SVP's and NGI's is justified with respect to the right not to testify. Because we will order the trial court to confirm its order finding defendant to be an SVP and committing him to the Department if the court finds that the People have carried their burden, we proceed to consider defendant's remaining claims.

### B.     *Allowing Adverse Inferences from Refusal to Testify*

Defendant contends that his Fifth Amendment rights were violated "because he was chastised for refusing to answer questions that could have incriminated him." He references his refusal to answer questions designed at eliciting an admission that he had

22

been untruthful—i.e., that he had committed perjury—in prior court proceedings and notes that he retained Fifth Amendment rights despite the fact that this was a civil trial. (See *Griego v. Superior Court* (2000) 80 Cal.App.4th 568, 573.) Defendant contends that although his responses were ultimately stricken, he suffered prejudice because his prior testimony was admitted as a result of him invoking the Fifth Amendment and because the trial court indicated that the jury could consider defendant's refusal to testify when evaluating his credibility.

The Attorney General concedes that even if the prosecution had the right to call defendant as a witness, "it did not have the right to question him about matters that would tend to incriminate him, i.e., criminal acts for which he could still be punished." The Attorney General argues, however, that the questions posed by the prosecutor would not subject defendant to punishment because the prosecutor's final question asked whether defendant had previously admitted perjury. The Attorney General also argues that any error was harmless beyond a reasonable doubt because defendant did not respond to the prosecutor's questions about perjury, his "minimal" other testimony was stricken, and the jury was not instructed it could consider defendant's refusal to testify in determining his credibility.

We will assume, arguendo, that defendant had a Fifth Amendment right not to answer questions designed to elicit his admissions to perjury, and that the trial court therefore erred by failing to recognize that defendant had such a right and by informing defendant that if he refused to answer, "that can be assessed by the jury in determining your credibility, reliability, and accuracy." Beyond a reasonable doubt, the trial court's ruling and comment "did not contribute to the verdict obtained." (*Chapman, supra,* 386 U.S. at p. 24.) First, defendant did not admit perjury in response to any of the questions. Second, the jury was instructed not to consider defendant's testimony, and although the trial court warned defendant that the jury could consider his refusal to testify in determining his credibility, the trial court never gave the jury itself such an instruction.

23

Finally, defendant's prior testimony would have been admissible even if the trial court had found that defendant had a valid Fifth Amendment privilege, because defendant still would have been unavailable. (See Evid. Code, §§ 240, subd. (a)(1), 1291, subd. (a).) Any error was therefore harmless beyond a reasonable doubt.

### C.    *Admission of Hearsay and Exclusion of Impeachment Evidence*

Defendant contends the trial court erred by allowing the prosecution to present the hearsay statement of one of defendant's victims, Rodolfo, and by refusing to allow the defense to introduce evidence of Rodolfo's 1996 sexual battery conviction for impeachment. Defendant contends the error violated his right to cross-examine witnesses.

### 1.    **Proceedings Below**

In limine, defendant moved to exclude "*all* hearsay evidence." Defendant's motion listed a number of statements he sought to exclude, including "any statement by [Rodolfo] that a knife was used." Defendant asserted that the statement was unreliable because "[a] knife was never found and the prosecutor declined to charge [defendant] with an arming allegation." Defendant further argued that Rodolfo's statement should be excluded pursuant to Evidence Code section 352 because its admission could lead to juror prejudice, confusion of the issues, and undue consumption of time.

The trial court denied, as overbroad, defendant's motion to exclude "all hearsay." The trial court also specifically ruled that the prosecution could introduce Rodolfo's statement about defendant using a knife.

The prosecution introduced Rodolfo's statement through Dr. Patterson. The defense then elicited Dr. Starr's testimony that in defendant's criminal trial stemming from the Rodolfo incident, the trial court had found an arming allegation untrue. Dr. Starr testified that in her opinion, the not true finding did not indicate Rodolfo was not credible. Rodolfo's account of the incident had contained "some inconsistencies" but in general, he had been consistent, and defendant had corroborated many details.

24

At the end of trial, defendant's trial counsel sought to introduce evidence that Rodolfo had suffered a sexual battery conviction in 1996. The trial court excluded the evidence under Evidence Code section 352 "due to the undue consumption of time" and the fact that "it's not an issue that has great moment with respect to the issue in this case."

### 2. Analysis

We first address defendant's claim that the trial court should not have permitted the prosecution to introduce Rodolfo's hearsay statement about defendant's use of a knife during the 1979 incident. Defendant acknowledges that experts are entitled to rely on hearsay statements in forming their opinions, but he argues that the trial court should have excluded the statement itself pursuant to Evidence Code section 352, because there was a risk the jury would use the statement as substantive evidence. (See *People v. Valdez* (1997) 58 Cal.App.4th 494, 511 (*Valdez*) [trial court can preclude expert from relating hearsay to jury under Evidence Code section 352].)

Under the circumstances, it was "well within the trial court's discretion" to allow the prosecution's experts to relate Rodolfo's statement. (*Valdez, supra,* 58 Cal.App.4th at p. 510.) The trial court reasonably determined that Rodolfo's statement about defendant's use of a knife did not "create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352, subd. (b).) The evidence established that defendant had used a knife in committing other offenses—those involving the two juveniles (James and Adam)—so the Rodolfo statement was not particularly inflammatory. Further, defendant was able to elicit evidence that an arming allegation was not found true in the trial of the Rodolfo robbery.

We next turn to defendant's claim that the trial court erred by precluding defendant from introducing Rodolfo's 1996 sexual battery conviction as impeachment evidence. The Attorney General first points out that although evidence of prior felony convictions is admissible "to attack the credibility of a hearsay declarant" under Evidence

25

Code sections 788 and 1202 (see *People v. Jacobs* (2000) 78 Cal.App.4th 1444, 1449), in this case the hearsay statement was not offered for its truth but as the basis for expert opinion. Since hearsay is defined as a statement that is "offered to prove the truth of the matter stated" (Evid. Code, § 1200, subd. (a)), Rodolfo's credibility could not be attacked by admission of his felony conviction. Even if admissible, however, the trial court did not abuse its discretion by excluding the conviction pursuant to Evidence Code section 352. The conviction's probative value was decreased by the fact Rodolfo suffered the conviction about 17 years after he made the statement about defendant using the knife. Further, to the extent the conviction cast doubt on Rodolfo's credibility, it was somewhat cumulative of the evidence that an arming allegation had been found not true in the 1979 robbery trial. Under these circumstances, the trial court reasonably found that the conviction would consume an undue amount of time and reasonably excluded the evidence under Evidence Code section 352.

### D. *Failure to Give Pinpoint Instruction*

Defendant contends the trial court erred by failing to give a pinpoint instruction on the meaning of the word "likely," which would have included the phrase "high risk of offense."

#### 1. Proceedings Below

As noted above, defendant requested the pinpoint instruction in his motions in limine. Defendant's proposed instruction provided: "The word 'likely' as used in this definition means the person presents a substantial danger, that is, a serious and well-founded risk that he will commit sexually violent predatory crimes if free in the community. **It does not mean that it must be more probable than not that there will be an instance of reoffending. However, you may not find the respondent to be a sexually violent predator unless you find that the respondent does in fact present a high risk of re-offense.**" (Bold in original.)

26

The trial court declined to give defendant's proposed instruction and instructed the jury pursuant to CALJIC No. 4.19, as follows: "The term 'Sexually Violent Predator' means a person who: One, has been convicted of a sexually violent offense against one or more victims, and two, has a diagnosed mental disorder, and three, the disorder makes him a danger to the health and safety of others, in that it is likely that he will engage in sexually violent predatory criminal behavior. [¶] The word 'likely,' as used in this definition, means that the person presents a substantial danger, that is a serious and well-founded risk that he will commit sexually violent predatory crimes if free in the community. [¶] The term 'likely,' as used in this definition, means much more than a mere possibility, but it does not mean more likely than not. In other words, the likelihood that the person will engage in such conduct does not have to be greater than 50 percent."

### 2. Analysis

A defendant "has a right to an instruction that pinpoints the theory of the defense." (*People v. Mincey* (1992) 2 Cal.4th 408, 437, italics omitted.) The trial court may, however, "properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence [citation]." (*People v. Moon* (2005) 37 Cal.4th 1, 30 (*Moon*).) We apply the de novo standard of review when determining whether the trial court erred in refusing to give a requested pinpoint instruction. (*People v. Johnson* (2009) 180 Cal.App.4th 702, 707.)

The language in defendant's proposed pinpoint instruction is taken from *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888 (*Ghilotti*). In that case, the court explained that in the word "likely," when used in the context of the likelihood of re-offense, "must be given a meaning consistent with the statute's clear overall purpose," which is "to protect the public from that limited group of persons who were previously convicted and imprisoned for violent sex offenses, and whose terms of incarceration have ended, but whose current mental disorders so impair their ability to control their violent

27

sexual impulses that they *do in fact* present a high risk of reoffense if they are not treated in a confined setting." (*Id.* at p. 921.) The *Ghilotti* court concluded that the phrase "likely to engage in acts of sexual violence" (Welf. & Inst. Code, § 6601, subd. (d)) "connotes much more than the mere *possibility* that the person will reoffend as a result of a predisposing mental disorder that seriously impairs volitional control." (*Ghilotti, supra,* at p. 922.) The court held that an alleged SVP "is 'likely' to reoffend if, because of a current mental disorder which makes it difficult or impossible to restrain violent sexual behavior, the person presents a *substantial danger*, that is, a *serious and well-founded risk*, that he or she will commit such crimes if free in the community." (*Ibid.*)

In *Ghilotti,* the California Supreme Court rejected the argument that "constitutional principles of substantive due process, as applicable to involuntary civil commitment statutes, require a limitation of such commitments to persons who are 'highly likely' to reoffend." (*Ghilotti, supra,* 27 Cal.4th at p. 923.) The court was unpersuaded that "a valid involuntary commitment law requires proof that the person is *more likely than not* to reoffend." (*Ibid.*) It determined that "the state has a compelling protective interest in the confinement and treatment of persons who have already been convicted of violent sex offenses, and who, as the result of current mental disorders that make it difficult or impossible to control their violent sexual impulses, represent a *substantial danger* of committing similar new crimes [citations], even if that risk cannot be assessed at greater than 50 percent." (*Id.* at p. 924.)

A full reading of *Ghilotti* shows that defendant's proposed instruction was likely to confuse and mislead the jury regarding the meaning of "likely" as used in the definition of "sexually violent predator" and that the trial court's instruction adequately and accurately defined the term "likely." The trial court therefore did not err in refusing to give that instruction. (See *Moon, supra,* 37 Cal.4th at p. 30.)

28

### E. Use of Term "Sexually Violent Predator"

Defendant contends the trial court erred by allowing the prosecution to use the term "sexually violent predator" at trial, over his objection. As noted above, defendant sought this ruling in his motions in limine, but the trial court found that the term "sexually violent predator" could be used during the trial.

Trial courts have a duty to advise the jury of the legal principles necessary for a proper evaluation of the case. (See *People v. DePriest* (2007) 42 Cal.4th 1, 50.) Using the defining language from a statute is an appropriate way to inform the jury about the definition of the offense. (*People v. Estrada* (1995) 11 Cal.4th 568, 574; *People v. Poggi* (1988) 45 Cal.3d 306, 327.)

Welfare and Institutions Code section 6600, subdivision (a)(1) defines the term " '[s]exually violent predator' " as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior."

Here, the trial court did not abuse its discretion by permitting the prosecution to use the defining term contained in the applicable statute, since the jury was required to prove that defendant fit the definition of that term ("sexually violent predator"). Further, nothing in the record shows that the use of the phrase "sexually violent predator" resulted in prejudice to defendant, and thus the trial court's ruling did not violate defendant's rights to due process and a fair trial.

### F. Cumulative Error

Defendant contends the cumulative effect of the errors in his case denied him a fair trial. (See *People v. Hill* (1998) 17 Cal.4th 800, 844 ["a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error"].) We are remanding the matter for a determination of whether defendant had an equal protection right not to testify. We determined that even

if the trial court erred by finding that defendant had no Fifth Amendment privilege with respect to questions designed to elicit his admissions to perjury, the error was harmless. We found that none of defendant's other claims have merit. Thus, there is no cumulative prejudice.

### G. Indeterminate Commitment

Defendant contends that his indeterminate commitment under the SVPA, as amended in 2006, violates equal protection, due process, and ex post facto principles of the federal Constitution.[6]

### 1. Equal Protection

Defendant's equal protection argument has been rejected in *McKee II, supra,* 207 Cal.App.4th 1325 and in subsequent appellate court decisions, including *People v. McDonald* (2013) 214 Cal.App.4th 1367 (*McDonald*), *People v. Landau* (2013) 214 Cal.App.4th 1 (*Landau*), *People v. McCloud* (2013) 213 Cal.App.4th 1076, and *People v. McKnight* (2012) 212 Cal.App.4th 860 (*McKnight*).

As an initial matter, defendant argues that *McKee II* is not binding authority on this court and that he is entitled to present his own evidence on the question of whether an indefinite commitment violates equal protection as a matter of due process. However, the California Supreme Court not only denied review in *McKee II, McDonald, Landau,* and *McKnight*, but it clearly indicated its belief that the remand proceedings following *McKee I* would be determinative of the equal protection issue state-wide. As the *McKnight* court noted, the California Supreme Court transferred "the multiple 'grant and

---

[6] Before 2006, an individual determined to be an SVP was committed to the custody of the Department of Mental Health for a two-year term, which could be extended for additional two-year periods. (Former Welf. & Inst. Code, § 6604, as amended by Stats. 2000, ch. 420, § 3; former Welf. & Inst. Code, § 6604.1, as amended by Stats. 2000, ch. 420, § 4.) In 2006, through both legislation and a voter initiative, the SVPA was amended to provide for an indeterminate term of commitment. (Stats. 2006, ch. 337, §§ 55, 56; Prop. 83; see *People v. Whaley* (2008) 160 Cal.App.4th 779, 785-787.)

hold' cases under *McKee I* . . . to the Courts of Appeal with directions to vacate their prior opinions and suspend further proceedings until the *McKee I* remand proceedings were final, '*in order to avoid an unnecessary multiplicity of proceedings*.' " (*McKnight, supra,* 212 Cal.App.4th at p. 863.)

Defendant next contends *McKee II* was wrongly decided. First, defendant claims that the *McKee II* court applied a deferential standard of review rather than an independent standard of review. Defendant acknowledges that the appellate court stated that it was conducting a de novo review (*McKee II, supra,* 207 Cal.App.4th at p. 1338), but he asserts that the court actually performed a substantial evidence review. Having reviewed the opinion, we believe the *McKee II* court's description of its review is consistent with an independent, de novo review of the evidence, as well as with the California Supreme Court's opinion and directions in *McKee I.* After the *McKee I* court remanded the case, the *McKee II* court independently reviewed *all* of the evidence and concluded that "the disparate treatment of SVP's under the [SVPA] is reasonable and factually based and was adequately justified by the People at the evidentiary hearing on remand." (*McKee II, supra,* 207 Cal.App.4th at p. 1348; see *McKnight, supra,* 212 Cal.App.4th at p. 864 [finding that the "claim that the appellate court failed to independently review the trial court's determination is frivolous"]; *Landau, supra,* 214 Cal.App.4th at pp. 47-48; *McDonald, supra,* 214 Cal.App.4th at pp. 1378, 1381.)

Second, defendant claims that the *McKee II* court in effect applied a rational basis test rather than a strict scrutiny test in reviewing the evidence presented at the hearing. We disagree that *McKee II* failed to apply strict scrutiny. The *McKee II* court referred to the issue as "whether the People presented substantial evidence to support a reasonable inference or perception that the [SVPA's] disparate treatment of SVP's is *necessary* to further compelling state interests. [Citations.]" (*McKee II, supra,* 207 Cal.App.4th at p. 1339, italics added.) Moreover, the appellate court's use of the phrase "reasonable inference or perception" (*ibid.*) reflects the California Supreme Court's remand

31

instructions. In *McKee I,* the court stated, "On remand, the government will have an opportunity to justify Proposition 83's indefinite commitment provisions . . . and demonstrate that they are based on a reasonable perception of the unique dangers that SVP's pose rather than a special stigma that SVP's may bear in the eyes of California's electorate." (*McKee I, supra,* 47 Cal.4th at p. 1210, fn. omitted.) Thus, in applying the strict scrutiny test, *McKee II* followed the language set forth in *McKee I.*

Moreover, we agree with the *McKee II* court's statement that "[w]e are unpersuaded the electorate that passed Proposition 83 in 2006 was required to adopt the least restrictive means available (e.g., a two-year or other determinate term of civil commitment) in disparately treating SVP's and furthering the compelling state interests of public safety and humane treatment of the mentally disordered." (*McKee II, supra,* 207 Cal.App.4th at p. 1349.) Given the evidence presented in *McKee II*—that the vast majority of SVP's are diagnosed with pedophilia or other paraphilias, that a paraphilia ordinarily persists throughout a patient's lifetime, that treatment is not focused on medication, and that most SVP's do not participate in treatment (*id.* at pp. 1344-1345)— we have no basis for concluding that an indeterminate term is not necessary to further the compelling state interest in providing treatment to SVP's and protecting the public or that there is any less burdensome alternative to effectuate those interests.

Defendant's third contention is that the *McKee II* court's analysis was flawed because the trial court had not analyzed the electorate's "actual motivation" for amending the SVPA but rather evidence "about the theoretical reasons" for requiring indeterminate commitment terms. We find no merit in this contention. As we have discussed, the *McKee II* court's analysis was consistent with the remand instructions of the California Supreme Court in *McKee I*: "On remand, the government will have an opportunity to justify Proposition 83's indefinite commitment provisions . . . and demonstrate that they are based on a reasonable perception of the unique dangers that SVP's pose rather than a

special stigma that SVP's may bear in the eyes of California's electorate." (*McKee I, supra,* 47 Cal.4th at p. 1210, fn. omitted.)

Defendant's fourth claim is that the *McKee II* court failed to require that the indeterminate term provision of the SVPA be "narrowly tailored" to serve its "purported purpose." In *McKee II,* the defendant similarly argued that the SVPA was unconstitutional unless it adopted the "least restrictive means available." (*McKee II, supra,* 207 Cal.App.4th at p. 1349.) The *McKee II* court rejected this argument, explaining, "[O]ur review of equal protection case law shows the two-part test, as discussed in *Moye*[, *supra,* 22 Cal.3d 457] and *McKee* [*I* ], is the prevailing standard. . . . Therefore, in strict scrutiny cases, the government must show both a compelling state interest justifying the disparate treatment *and* that the disparate treatment is necessary to further that compelling state interest. [Citations.] We are unpersuaded the electorate that passed Proposition 83 in 2006 was required to adopt the least restrictive means available (e.g., a two-year or other determinate term of civil commitment) in disparately treating SVP's and furthering the compelling state interests of public safety and humane treatment of the mentally disordered." (*McKee II, supra,* at p. 1349.)

We agree with the *McKee II* court's analysis of this issue. In remanding the case in *McKee I,* the California Supreme Court instructed the trial court to "apply[ ] the equal protection principles articulated in *Moye* and related cases discussed in the [*McKee I* ] opinion" (*McKee I, supra,* 47 Cal.4th at p. 1208), and to determine whether, after a trial, the People had shown that imposing on SVP's greater burdens to obtain release from commitment is necessary to promote the state's compelling interests in public safety and humane treatment of the mentally ill (*id.* at pp. 1207-1211). The evidence the People presented in *McKee II*—that the vast majority of SVP's are diagnosed with pedophilia or other paraphilias, that a paraphilia ordinarily persists throughout a patient's lifetime, that treatment is not focused on medication, and that most SVP's do not participate in treatment (*McKee II, supra,* 207 Cal.App.4th at pp. 1344-1345)—supported the

33

conclusion that an indeterminate term is necessary to further the compelling state interest in providing treatment to SVP's and protecting the public. We thus have no basis to hold otherwise or determine that there is any less burdensome or narrowly tailored alternative to effectuate those interests.

Finally, defendant contends the *McKee II* court failed to address or distinguish *In re Calhoun* (2004) 121 Cal.App.4th 1315 (*Calhoun*) to the extent it held that differences between MDO's and SVP's did not justify different schemes for forcible administration of medication. However, the equal protection issue in *McKee II* turned on the differences in SVP's and MDO's recidivism rates, dangerousness, and diagnosis and treatment. (*McKee II, supra,* 207 Cal.App.4th at pp. 1340-1347.) The equal protection issue in *Calhoun,* in contrast, turned on whether there were any differences between SVP's and MDO's regarding the need for and effectiveness of antipsychotic medication. The decision in *Calhoun* thus has little relevance to the issues presented in *McKee II.* (See *McKee I, supra,* 47 Cal.4th at p. 1220, fn. 4 (conc. & dis. opn. of Chin, J.) [noting that *Calhoun* "hardly applies here" because the "exact criteria for medicating mentally disordered offenders is an entirely different matter from the procedures adopted for releasing them into society"].)

In light of the California Supreme Court's clearly expressed intent to avoid an unnecessary multiplicity of proceedings, the denial of review in *McKee II,* and our conclusions regarding the asserted flaws in *McKee II,* we find that defendant's equal protection claims are without merit.

### 2.     Due Process

In *McKee I,* the California Supreme Court determined that a person subject to an indefinite commitment under the amended SVPA is not deprived of due process because he or she has the burden, after the initial commitment, to show by a preponderance of the evidence that he or she no longer meets the statutory criteria for commitment as an SVP. (*McKee I, supra,* 47 Cal.4th at p. 1191.) The *McKee I* court also found no merit in the

contention that the trial court's discretion to deny as frivolous a committed person's petition for conditional release pursuant to section 6608, subdivision (a) violates due process. (*McKee I, supra,* at p. 1192.) Finally, the *McKee I* court construed the amended SVPA to implicitly provide for the appointment of a state-funded mental health expert when a committed person petitions for release under section 6608, subdivision (a), and that as so construed, "it does not violate the due process clause." (*McKee I, supra,* at p. 1193.)

Defendant contends the due process issues addressed in *McKee I* "must be revisited." However, we are bound by *McKee I* (see *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity Sales*)) and therefore must reject defendant's due process contention.

### 3. Ex Post Facto and Double Jeopardy

Defendant contends that the SVPA's requirement of an indeterminate commitment renders the SVPA punitive in nature and violates the ex post facto and double jeopardy clauses of the federal constitution.

In *McKee I,* the California Supreme Court reiterated its decision in *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138 that the SVPA was not punitive because it had two nonpunitive objectives, "treatment for the individual committed and protection of the public." (*McKee I, supra,* 47 Cal.4th at p. 1194.) After examining the amended SVPA, the *McKee I* court determined that "the Proposition 83 amendments at issue here cannot be regarded to have changed the essentially nonpunitive purpose of the [SVPA]," and therefore that the amended SVPA does not violate the ex post facto clause. (*Ibid.*)

In light of the California Supreme Court's holding in *McKee I* that the amended SVPA is not punitive in nature, defendant's ex post facto and double jeopardy claims are without merit. (See *People v. Carlin* (2007) 150 Cal.App.4th 322, 348, italics omitted [California Supreme Court's determination that SVPA is not punitive " 'removes an

35

essential prerequisite for both . . . double jeopardy and ex post facto claims' "]; *Auto Equity Sales, supra,* 57 Cal.2d at p. 455.)

## IV.    DISPOSITION

The matter is remanded to the trial court for further proceedings.  On remand, the trial court is directed to conduct an evidentiary hearing at which the People will have the opportunity to show that the differential statutory treatment of SVP's and NGI's is justified with respect to the right not to testify.  If the trial court determines the People have carried their burden to justify that differential treatment, it shall confirm its order finding defendant to be an SVP and committing him to the Department of Mental Health. If the trial court determines the People have not carried their burden, the trial court shall conduct a new hearing under the SVPA to determine whether defendant is an SVP.

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____
ELIA, ACTING P.J.

_____
MIHARA, J.

*People v. Stillwell*
**H041819**